# EXHIBIT A



**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6000

July 12, 2005

## CERTIFICATE OF CORPORATE EXISTENCE

REFERENCE:  World Savings Bank, FSB
Oakland, California

I, Nadine Y. Washington, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

1.  World Savings Bank, FSB, Oakland, California, was chartered under the laws of the United States to transact the business of a Federal savings bank;

2.  The charter of World Savings Bank, FSB, Oakland, California, is in full force and effect;

3.  The Office of Thrift Supervision has not appointed a conservator or receiver for World Savings Bank, FSB, Oakland, California; and

4.  As of July 12, 2005, World Savings Bank, FSB, Oakland, California, is operating as a BIF-insured financial institution.

*Albert B. Samson for*
Nadine Y. Washington
Corporate Secretary





**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6000

**April 21, 2006**

## CERTIFICATE OF CORPORATE EXISTENCE

**REFERENCE:** World Savings Bank, FSB
Oakland, California

I, Nadine Y. Washington, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

1. World Savings Bank, FSB, Oakland, California, was chartered under the laws of the United States to transact the business of a Federal savings bank;

2. The charter of World Savings Bank, FSB, Oakland, California, is in full force and effect;

3. The Office of Thrift Supervision has not appointed a conservator or receiver for World Savings Bank, FSB, Oakland, California; and

4. As of April 21, 2006, World Savings Bank, FSB, Oakland, California, is operating as a BIF-insured financial institution.

**Nadine Y. Washington**
**Corporate Secretary**

# OTS

## ⊛ Office of Thrift Supervision

| News & Events | Applications | Supervision | Public Info | Consumer & Community | DATA & RESEARCH | TFR | About OTS |
|---|---|---|---|---|---|---|---|

Home > Data & Research > Corporate Directories > Institution Directory Database

## Results of Search

Your search retrieved **1** record *(1 page).*                    Record **1** to **1** of **1**.

Click on CSV to download these results in Comma Separated Value (text) format.

| CSV | Return to Search | New Search |
|---|---|---|

*Updated: Thursday, February 19, 2004 at 7:49 AM*

| Docket/ Region | Name/Location Telephone | Officer/Title Mailing Address | Charter Type Assets ($000) |
|---|---|---|---|
| 1. 12642  West | **World Savings Bank, FSB** 1970 Broadway Oakland, CA 94612-0000 510-446-6000 | **Herbert Sandler** *COB, CEO* 1901 Harrison St Oakland, CA 94612-3574 | BIF Fed Stk SB $ 76,219,120 |

New Search

| Enter Keywords | Search OTS Web Site |
|---|---|

[privacy policy]  [search]  [help]  [home]

**EXHIBIT B**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ELMER and KATHY BUICK,                    No. 2:07-CV-01447-MCE-KJM

        Plaintiffs,

    v.                                    <u>MEMORANDUM AND ORDER</u>

WORLD SAVINGS BANK,
TRANSAMERICAN FINANCIAL
CORPORATION,

        Defendants.

----oo0oo----

    Plaintiffs, Elmer and Kathy Buick, filed this action against
Defendants, Transamerican Financial Corporation ("Transamerican")
and World Savings Bank ("World"), for claims arising under the
Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 <u>et seq.</u>, and
California's Unfair Business Practices Act ("UCL"), California
Business & Professions Code § 17200 <u>et seq.</u>, as well as for
fraud, negligent misrepresentation, and breach of fiduciary duty.

/// 

/// 

/// 

1

1    Plaintiffs subsequently dropped their fraud and negligent

2    misrepresentation claims against all parties, but still maintain

3    their TILA, UCL, and breach of fiduciary duty claims against

4    World.  Presently before the Court is World's Motion to Dismiss

5    those claims.[1]

6

7                           **BACKGROUND**[2]

8

9         In 2004, World marketed its Pick-a-Payment[SM] Equity Builder[SM]

10   Mortgage.  That loan had an initial low interest rate that

11   expired after three months.  The loan was structured in such a

12   way that it could potentially result in negative amortization,

13   which occurs when, despite a customer making the required minimum

14   payments, the principal owed on the loan increases, rather than

15   decreases, over the life of the loan.  Plaintiffs allege that

16   referring to a loan that can result in negative amortization as

17   an "Equity Builder[SM]" loan is false and misleading.

18        Plaintiffs further allege that World knew or should have

19   known that brokers marketing that Equity Builder[SM] loan would

20   promote its low initial rate and minimize both its higher

21   eventual interest rates and its potential for negative

22   amortization.

23   ///

24   ───────────────

25        [1] Because oral argument will not be of material assistance,
     the Court ordered this matter submitted on the briefing.  E.D.
26   Cal. Local Rule 78-230(h).

27        [2] The following facts are taken primarily from Plaintiffs'
     Complaint.  For the purposes of this Motion, the Court accepts
28   these facts as true and makes all inferences in the light most
     favorable to Plaintiffs.

1    Additionally, Plaintiffs allege that World knew that the label

2    Equity Builder[SM] was misleading, confusing, and conflicted with

3    other disclosures.  According to Plaintiffs, World provided

4    customers with documents that referenced only the low initial

5    rate, without explaining that the rate would increase in the

6    future.

7         World marketed its products through agents.  One agent was

8    Dirk Kuivenhoven, also known as Dirk Johnson, also known as Mark

9    Rawlings ("Mr. Kuivenhoven").  Mr. Kuivenhoven, a licensed

10   California mortgage broker, was Transamerican's branch manager in

11   2004.

12        In March of 2004, under the alias Dirk Johnson and on the

13   letterhead of Direct Lenders, a name Plaintiffs believe to be an

14   alias of Transamerican, Mr. Kuivenhoven sent a letter to

15   Plaintiffs offering to reduce their mortgage payments by

16   refinancing their loan at a 3.5% interest rate.  Specifically

17   that letter stated:

18        Here's what you can expect from me:
         1.   I handle all of the details from your first call
19            to closing.
         2.   I keep you up to date and well informed as we walk
20            thru [sic] the process.
         3.   I make sure you get the best rate and loan
21            possible.
         4.   I give you honest straight forward information.
22

23        When Plaintiffs subsequently met with Mr. Kuivenhoven, he

24   told them he would get them an Equity Builder[SM] loan with an

25   initial rate of 1.95% and that the loan balance would decrease as

26   long as Plaintiffs made the required minimum payments.

27   ///

28   ///

3

 1   Mr. Kuivenhoven also allegedly assured them that they could
 2   convert the loan to a fixed rate loan by contacting World, that
 3   the interest rate on the mortgage would never exceed 4.798%, and
 4   that the bi-weekly payments would peak at $616 in the eighth
 5   year.
 6       When Mr. Kuivenhoven prepared the World loan application, he
 7   indicated that the interest rate would be 1.95%, and checked the
 8   "Other" box to indicate the loan type, but he did not include any
 9   elaboration of the details of the particular type of loan.
10       Plaintiffs' loan closed on June 10, 2004.  World provided
11   Plaintiffs with a copy of their loan application and Uniform
12   Underwriting and Transmittal Summary, both of which showed a
13   1.95% interest rate.  Additionally, World delivered each borrower
14   copies of the notice of his or her right to rescind ("Notice"),
15   though Plaintiffs allege that Ms. Buick received only one copy,
16   rather than the two copies required under the regulations.
17       Plaintiffs further allege that they trusted, believed and
18   reasonably relied upon Mr. Kuivenhoven's representations about
19   the Equity Builder$^{SM}$ loan.  Therefore, they did not read the loan
20   papers on signing because they assumed those documents were
21   consistent with Mr. Kuivenhoven's representations.
22       Plaintiffs allege that the loan terms were not as promised
23   and that they were victims of a bait and switch.  Though the
24   initial loan rate was 1.95%, that rate was only applicable for up
25   to two months after closing and could adjust up to 11.950%.
26   ///
27   ///
28   ///

4

1  According to Plaintiffs, their current loan terms are far worse
2  than those under their prior mortgage, the deal they were
3  promised, or the loan that they could have gotten in a fair
4  market transaction.

5

6                              **STANDARD**

7  **A.   Motion to Dismiss Under Rule 12(b)(6)**

8

9       On a motion to dismiss for failure to state a claim under
10  Rule 12(b)(6), all allegations of material fact must be accepted
11  as true and construed in the light most favorable to the
12  nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336,
13  337-38 (9th Cir. 1996).  Rule 8(a)(2) requires only "a short and
14  plain statement of the claim showing that the pleader is entitled
15  to relief" in order to "give the defendant fair notice of what
16  the...claim is and the grounds upon which it rests."  Bell Atl.
17  Corp. v. Twombly, --- U.S. ----, 127 S. Ct. 1955, 1964 (2007)
18  (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  While a
19  complaint attacked by a Rule 12(b)(6) motion to dismiss does not
20  need detailed factual allegations, a plaintiff's obligation to
21  provide the "grounds" of his "entitlement to relief" requires
22  more than labels and conclusions, and a formulaic recitation of
23  the elements of a cause of action will not do.  Id. at 1964-65
24  (internal citations and quotations omitted).  Factual allegations
25  must be enough to raise a right to relief above the speculative
26  level.
27  ///
28  ///

1  Id. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and
2  Procedure § 1216, pp. 235-36 (3d ed. 2004) ("The pleading must
3  contain something more...than...a statement of facts that merely
4  creates a suspicion [of] a legally cognizable right of action")).
5       A court granting a motion to dismiss a complaint must then
6  decide whether to grant leave to amend.  A court should "freely
7  give" leave to amend when there is no "undue delay, bad faith[,]
8  dilatory motive on the part of the movant, . . . undue prejudice
9  to the opposing party by virtue of . . . the amendment, [or]
10 futility of the amendment...."  Fed. R. Civ. P. 15(a); <u>Foman v.</u>
11 <u>Davis</u>, 371 U.S. 178, 182 (1962).  Generally, leave to amend is
12 denied only when it is clear the deficiencies of the complaint
13 cannot be cured by amendment.  <u>DeSoto v. Yellow Freight Sys.,</u>
14 <u>Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992).

16      **B.    General Pleading Requirements**

18      "Rule 8(a)(2)...requires a 'showing,' rather than a blanket
19 assertion of entitlement to relief.  Without some factual
20 allegation in the complaint, it is hard to see how a claimant
21 could satisfy the requirements of providing not only 'fair
22 notice' of the nature of the claim, but also 'grounds' on which
23 the claim rests."  <u>Twombly</u>, 127 S. Ct. at 1965 n.3. (factual
24 allegations necessary to plead "grounds" on which claim rests.)
25      A pleading must contain "only enough facts to state a claim
26 to relief that is plausible on its face."  <u>Id</u>. at 1974.  If the
27 "plaintiffs...have not nudged their claims across the line from
28 conceivable to plausible, their complaint must be dismissed."

1   Id.   Nevertheless, "[a] well-pleaded complaint may proceed even

2   if it strikes a savvy judge that actual proof of those facts is

3   improbable, and 'that a recovery is very remote and unlikely.'"

4   Id. at 1965.

5

6                            **ANALYSIS**

7   A.    **Plaintiffs Allege Facts Sufficient to State a TILA
           Claim Against World.**

8

9          1.   **Plaintiffs Adequately Plead World's Failure to
                 Provide the Requisite Number of Notices.**

10

11         The most straight-forward of Plaintiffs' TILA claims is

12   that, at closing, they did not receive the proper number of

13   Notices of their right to rescind.  Federal regulations state,

14   "In a transaction subject to rescission, a creditor shall deliver

15   two copies of the notice of the right to rescind to each consumer

16   entitled to rescind."  12 C.F.R. § 226.23(b)(1).  Furthermore,

17   "[i]f the required notice...[is] not delivered, the right to

18   rescind shall expire 3 years after consummation, upon transfer of

19   all of the consumer's interest in the property, or upon sale of

20   the property, whichever occurs first."  12 C.F.R. § 226.23(a)(3).

21   Plaintiffs allege that Ms. Buick received only one Notice.  If

22   true, they argue, Plaintiffs' rescission period extended to

23   include the three-year period following consummation of the

24   agreement, and Plaintiffs' May 7, 2007, request to rescind was

25   timely.

26   ///

27   ///

28   ///

                                  7

1    World disagrees and argues that Ms. Buick actually received

2  both Notices.  World produced a signed copy of the Notice to

3  support its assertion.  Nevertheless, World's form serves only to

4  create a rebuttable, rather than conclusive, presumption that

5  Ms. Buick received that document.  15 U.S.C. 1635(c).  Plaintiffs

6  are, therefore, entitled to rebut that presumption.

7    Accordingly, Plaintiffs claim that, though Ms. Buick may

8  have signed World's copy, that copy was never delivered to her as

9  required by the regulations.  Construing all facts in the light

10 most favorable to Plaintiffs, the Court cannot say that they have

11 failed to state a claim.  Plaintiffs may be able to provide

12 sufficient evidence to support their assertion that the second

13 copy of the notice was not delivered to Ms. Buick.  Hence,

14 World's defense that both Plaintiffs received all required copies

15 is not sufficient to warrant dismissal.

16   Alternatively, World argues that, regardless of the above

17 analysis, one Notice is all that TILA requires in this case

18 because Plaintiffs are married co-borrowers.  World relies on an

19 unpublished Ohio state case and a Federal Bankruptcy Court case

20 from Kansas to support its position.

21   First, in Contimortgage v. Delawder, the Ohio state court

22 was unable to determine, after a bench trial, how many notices

23 those co-borrowers actually received.  2001 WL 884085 (4th Dist.

24 Ohio 2001).  Nevertheless, the trial court stated that, even if

25 the requisite number had not been delivered, "these problems

26 constituted mere technical violations of TILA and did not extend

27 the right or rescission."  Id. at *3.

28 ///

8

1  The appellate court noted that the trial court's decision was

2  consistent with precedent holding "TILA does not require perfect

3  notice; rather, it requires a clear and conspicuous notice of

4  rescission rights." Id. (citing Smith v. Highland Bank, 108 F.3d

5  1325, 1327 (11th Cir. 1997); Veal v. Citibank, F.S.B., 85 F.3d

6  577, 580 (11th Cir. 1996)); In re Porter, 961 F.2d 1066, 1076 (3d

7  Cir. 1992)). However, that statement runs contrary to the

8  reasoning of the Ninth Circuit, which has long held that even

9  technical violations result in liability to the creditor. See

10  Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704

11  (9th Cir. 1986). Therefore, World's first case is inapposite.

12      World's reliance on In re Jones is similarly misplaced.

13  298 B.R. 451 (D. Kan. 2003). In that case, the court

14  specifically stated that both husband and wife were entitled to

15  two copies of the Notice of rescission. Id. at 459-460.

16  Nevertheless, World places great weight on dicta in which the

17  court stated, "If Jones and his wife conceded that each of them

18  received one copy of the ... Notice, the court might be inclined

19  to agree that the rescission period should not be extended

20  because they did not each receive a second copy of the Notice."

21  Id. at 459. However, that court also went on to point out:

22      The TILA and Regulation Z might easily have declared
        that co-borrowers who are spouses are entitled to only
23      one set of the required documents between them, but
        neither the statute nor the regulation does so.
24      Because the right to rescind under § 1635 exists only
        when borrowers are giving a mortgage on their home to
25      secure a loan, the most common co-borrowers are likely
        to be a married couple, so it is inconceivable that
26      Congress and the Federal Reserve Board overlooked this
        situation when they specified that each borrower with
27      the right to rescind must be given his or her own set
        of the documents containing all the required
28      information.

9

1   Id. At 460.

2        The Official Staff Commentary to 12 C.F.R. § 226.23(b)

3   confirms that court's last point:

> In a transaction involving joint owners, both of whom
> are entitled to rescind, both must receive the notice
> of the right to rescind and disclosures. For example,
> if both spouses are entitled to rescind a transaction,
> each must receive two copies of the rescission
> notice...and one copy of the disclosures.

8   12 C.F.R. Pt. 226, Supp. I, Federal Reserve Board Commentary to

9   Paragraph 23(b).  The Commentary is, at worst, persuasive

10  evidence that both husband and wife are entitled to receive two

11  copies of the Notices.  At best, according to at least one court,

12  the Commentary should be afforded the same deference as the

13  regulations themselves.  In re Wright, 133 B.R. 704, 708 (E.D.

14  Pa. 1991).  Therefore, this Court finds that both Plaintiffs were

15  entitled to receive two copies of the Notice.

16       Because Plaintiffs have adequately alleged that they

17  received less than the proper number of notices prescribed by

18  TILA, and because they similarly alleged enough facts to show

19  that they could potentially rebut the presumption created by

20  World's Motion, Plaintiffs have stated a claim against World

21  under TILA and World's Motion is denied.

23       **2.   Plaintiffs Are Not Prohibited from Seeking TILA
            Damages.**

25       World next asks this Court to strike Plaintiffs' TILA claim

26  for damages because Plaintiffs admit that they did not read the

27  loan documents and, therefore, cannot prove the reliance

28  necessary to show causation.

1    Federal Rule of Civil Procedure 12(f) provides, "The court may

2    strike from a pleading an insufficient defense or any redundant,

3    immaterial, impertinent, or scandalous matter." "A motion to

4    strike under Rule 12(f) should be denied unless it can be shown

5    that no evidence in support of the allegation would be

6    admissible, or those issues could have no possible bearing on the

7    issues in the litigation." <u>Gay-Straight Alliance Network v.</u>

8    <u>Visalia Unified Sch. Dist.</u>, 262, F. Supp. 2d 1088, 1099 (E.D.

9    Cal. 2001).

10    To support its argument World cites to <u>In re Smith</u>, in which

11    the Ninth Circuit stated, "[I]n order to receive actual damages

12    for a TILA violation..., a borrower must establish detrimental

13    reliance." 289 F.3d 1155, 1157 (9th Cir. 2002). However, that

14    opinion, and World's remaining authority, concerned a TILA

15    disclosure violation, not a violation based on a lender's failure

16    to provide the proper number of Notices to a borrower.

17    Additionally, World's failure to honor Plaintiffs'

18    rescission request, which they tendered within three years of the

19    allegedly defective Notice, constitutes a distinct and actionable

20    violation. <u>See In re Wright</u>, 133 B.R. 704 (E.D. Pa. 1991) ("The

21    failure of a lender to properly act on a rescission is a new

22    violation separate and distinct from the disclosure violation

23    that gave rise to the right to rescind.") (citing 15 U.S.C.

24    § 1640(g); 15 U.S.C. 1635(g)). Therefore, Plaintiffs' prayer for

25    damages is sufficient to the extent it is based on World's

26    alleged failure to provide the proper number of Notices or to

27    honor Plaintiffs' request to rescind.

28    ///

1   See <u>Belini v. Washington Mut. Bank, FA</u>, 412 F.3d 17, 25 (1st Cir.
2   2005) (finding creditor that improperly failed to honor
3   rescission request could be liable for damages under section
4   1640).

5        Finally, World further argues that Plaintiffs' TILA claim is
6   barred by the one-year statute of limitations.  <u>See</u> 15 U.S.C.
7   § 1640(e).  However, Plaintiffs have raised a viable claim under
8   TILA regarding World's failure to deliver the proper number of
9   Notices and failure to honor Plaintiffs' request to rescind.  The
10  statute of limitations would have begun to run at the time World
11  failed to honor Plaintiffs' rescission request based on the prior
12  alleged Notice violation.  Plaintiffs filed this action within
13  one-year of their request for rescission.  Hence, Plaintiffs'
14  damages claim is not time-barred for purposes of this motion, and
15  Defendant's Motion to Strike Plaintiffs' claim for damages under
16  TILA is denied.

17

18       **B.    Plaintiffs Fail to State a Claim Against World Under**
         **California's Unfair Competition Law Claim, California**
19       **Business & Professions Code § 17200 _et seq_.**

20

21       World claims that, since it is a Federal Savings Bank, Home
22  Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461 et seq.,
23  preempts Plaintiffs' state law claims.[3]  World argues that
24  Plaintiffs' UCL claims are preempted to the extent that they
25  attempt to regulate Worlds' disclosure and advertising practice.
26  ///

27  _____

28       [3] Plaintiffs do not dispute World's assertion that it is a
    federally chartered association.

                              12

1     At the beginning of this year, the Ninth Circuit addressed a

2  case similar to the one at hand. <u>See Silvas v. E*Trade Mortgage</u>

3  <u>Corp.</u>, 514 F.3d 1001 (9th Cir. 2008).  This Court quotes at

4  length from that decision because that analysis is directly

5  applicable here:

6          We have identified three ways federal law may
        preempt state law:
7

8             First, Congress may preempt state law by so
           stating in express terms. Second, preemption
9           may be inferred when federal regulation in a
           particular field is so pervasive as to make
10          reasonable the inference that Congress left
           no room for the States to supplement it. In
11          such cases of field preemption, the mere
           volume and complexity of federal regulations
12          demonstrate an implicit congressional intent
           to displace all state law. Third, preemption
13          may be implied when state law actually
           conflicts with federal law. Such a conflict
14          arises when compliance with both federal and
           state regulations is a physical
15          impossibility, or when state law stands as an
           obstacle to the accomplishment and execution
16          of the full purposes and objectives of
           Congress....

17  <u>Bank of Am. v. City and County of S.F.</u>, 309 F.3d 551,
     558 (9th Cir. 2002) (internal quotation marks and
18  citations omitted).

19     Appellants' arguments against preemption are
    premised on their assertion that *conflict* preemption
20  analysis applies to the case at bar. We agree, however,
    with the district court, and hold that *field* preemption
21  applies because Appellants' state law claims provide
    state remedies for violations of federal law in a field
22  preempted entirely by federal law. The general
    presumption against preemption is not applicable here,
23  and the relevant regulation is clear-the field of
    lending regulation of federal savings associations is
24  preempted.  See 12 C.F.R. § 560.2...
                   ...

25     While there is a strong presumption against
    federal preemption of state law governing historic
26  police powers, the Supreme Court has held that the
    presumption does not apply "when [a] State regulates in
27  an area where there has been a history of significant
    federal presence." <u>United States v. Locke</u>, 529 U.S.
28  89, 108 (2000).

13

1    "Congress has legislated in the field of banking
     from the days of M'Cullough v. Maryland, 17 U.S. (4
2    Wheat.) 316, creating an extensive federal statutory
     and regulatory scheme." Bank of Am., 309 F.3d at 558
3    (citation omitted). Specific to this case, Congress
     enacted the Home Owners' Loan Act of 1933 ("HOLA") to
4    charter savings associations under federal law, at a
     time when record numbers of home loans were in default
5    and a staggering number of state-chartered savings
     associations were insolvent. Id. at 559. HOLA was
6    designed to restore public confidence by creating a
     nationwide system of federal savings and loan
7    associations to be centrally regulated according to
     nationwide "best practices." Fid. Fed. Sav. & Loan
8    Ass'n v. de la Cuesta, 458 U.S. 141, 160-161 (1982).
     We have described HOLA and its following agency
9    regulations as a "radical and comprehensive response to
     the inadequacies of the existing state system," and "so
10   pervasive as to leave no room for state regulatory
     control." Conference of Fed. Sav. & Loan Ass'n v.
11   Stein, 604 F.2d 1256, 1257 (9th Cir. 1979), aff'd, 445
     U.S. 921. "[B]ecause there has been a history of
12   significant federal presence in national banking, the
     presumption against preemption of state law is
13   inapplicable." Bank of Am., 309 F.3d at 559 (internal
     quotation marks omitted).
14                                     . . .

15        Through HOLA, Congress gave the Office of Thrift
     Supervision ("OTS") broad authority to issue
16   regulations governing thrifts. 12 U.S.C. § 1464. As
     the principal regulator for federal savings
17   associations, OTS promulgated a preemption regulation
     in 12 C.F.R. § 560.2. That the preemption is expressed
18   in OTS's regulation, instead of HOLA, makes no
     difference because, "[f]ederal regulations have no less
19   preemptive effect than federal statutes." de la Cuesta,
     458 U.S. at 153. The regulation reads inter alia:

20        OTS hereby occupies the entire field of
          lending regulation for federal savings
21        associations. OTS intends to give federal
          savings associations maximum flexibility to
22        exercise their lending powers in accordance
          with a uniform federal scheme of regulation.
23        Accordingly, federal savings associations may
          extend credit as authorized under federal
24        law, including this part, without regard to
          state laws purporting to regulate or
25        otherwise affect their credit activities,
          except to the extent provided in paragraph
26        (c) of this section....

27   ///

28   ///

                           14

1    12 C.F.R. § 560.2(a) (emphasis added). Section
     560.2(b) goes on to provide a list of specific types of
2    state laws that are preempted, two of which, § 560.2
     (b)(5) and § 560.2(b)(9), are specifically applicable
3    to this case. [T]he types of state laws preempted by
     paragraph (a) of this section, include, without
4    limitation, state laws purporting to impose
     requirements regarding:

5         (5) Loan-related fees, including without
          limitation, initial charges, late charges,
6         prepayment penalties, servicing fees, and
          overlimit fees;
7                                   . . .

8         (9) Disclosure and advertising, including
          laws requiring specific statements,
9         information, or other content to be included
          in credit application forms, credit
10        solicitations, billing statements, credit
          contracts, or other credit-related documents
11        and laws requiring creditors to supply copies
          of credit reports to borrowers or applicants;

12   12 C.F.R. § 560.2(b)(5) and (9).

13   OTS, Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept.
14   30, 1996).

15   Silvas at 514 F.3d 1004-1005 (9th Cir. 2008) (internal headings

16   and footnote omitted). Based on the above authority, World

17   argues that Plaintiffs' UCL cause of action is preempted by HOLA.

18   Plaintiffs allege several grounds for relief under the UCL.

19   Cal. Bus. & Prof. Code §§ 17200 et seq. Defendants argue that

20   all of Plaintiffs' claims fall directly within the ambit of

21   section 560.2's express preemption of state laws attempting to

22   regulate a federal bank's advertising and disclosures.

23   Plaintiffs' allegations are as follows:

24   ///

25   ///

26   ///

27   ///

28   ///

                              15

1   As described above, defendants have committed acts of
    unfair competition, proscribed by Business and
2   Professions Code section 17200, et seq., including, but
    not limited to, the following:
3       a.    Representing that the loan obtained by plaintiffs,
              the "Equity Builder," would build the equity in
4             plaintiffs' home faster than other loans and, in
              doing so misled plaintiffs as to the potential for
5             and consequences of negative amortization;
        b.    Representing that the interest rate on plaintiffs'
6             mortgage would never exceed 4.798% when such
              representations were false;
7       c.    Representing that the initial interest rate on
              plaintiff' [sic] mortgage would be 1.95% and that
8             the interest rate on the loan would never exceed
              4.798% and, by doing so, misleading plaintiffs as
9             to the cost of credit;
        d.    Representing to plaintiffs that they would be able
10            to switch to a fixed rate loan at no cost when in
              fact the loan provided for a substantial
11            prepayment penalty during the first three years;
        e.    Representing to plaintiffs that Kuivenhoven and
12            Transamerican were working for plaintiffs and were
              loyal to their best interests when, in fact,
13            Kuivenhoven and Transamerican were employed by an
              adverse party;
14      f.    Representing to plaintiffs that they would be
              given the best possible loan terms and that their
15            mortgage interest rate would start at 1.95% and
              never exceed 4.798%.
16      g.    By engaging in a bait and switch by baiting
              plaintiffs into the mortgage transaction by
17            offering a relatively favorable set of terms and
              then switching to less favorable terms.
18      h.    By violating Business & Professions Code § 17500
              et seq. As set forth in paragraphs 11 through 25
19            herein.

20  SAC, ¶ 52.  With the exception of ¶ 52(e), each of these

21  allegations concerns World's advertising practices or fees and are

22  expressly preempted by the § 560.2.  See Silvas 514 F.3d at 1006.

23      Hence, Plaintiffs' only remaining viable claim falls under

24  ¶ 52(e).  Plaintiffs allege that Mr. Kuivenhoven improperly

25  maintained and misrepresented to Plaintiffs his relationship with

26  World.  Id.  Additionally, Plaintiffs argue that, under an agency

27  theory, World is responsible for Mr. Kuivenhoven's

28  misrepresentations.

16

1    Therefore, as a threshold matter, this Court must analyze

2    the sufficiency of Plaintiffs' agency allegations.  "One of the

3    chief characteristics of an agency relationship is the authority

4    to act for and in the place of the principal for the purposes of

5    bringing him or her into legal relations with third parties."

6    DSU Aviation, LLC v. PCMT Aviation, LLC, 2007 WL 3456564, *5

7    (N.D. Cal. 2007).  "The other important aspect in determining the

8    existence of an agency relationship is the degree of control

9    exercised by the principal over the activities of the agent."

10   Id.  "If the principal has the right to control the agent's day-

11   to-day operations, then an agency relationship exists.  If,

12   however, the principal has no control over the day-to-day

13   operations and only has [the] right to dictate the end result of

14   the agent's activities, then an 'independent contractor'

15   relationship exists."  Figi Graphics, Inc. v. Dollar Gen. Corp.,

16   33 F. Supp. 2d 1263, 1266 (S.D. Cal. 1998) (citing In re Coupon

17   Clearing Services, 113 F.3d 1090, 1099-1100 (9th Cir. 1997)).

18       Plaintiffs fail to allege sufficient facts to show that

19   Mr. Kuivenhoven had the authority to act on behalf of World.

20   Plaintiffs generally allege that Mr. Kuivenhoven is an agent and

21   co-conspirator of World.  Compl., ¶ 7.  Plaintiffs also

22   specifically allege that "World paid Mr. Kuivenhoven to market

23   its loans pursuant to a contract which gave World the right to

24   control who he could market to and what Mr. Kuivenhoven could say

25   about the World loan products he sold.

26   ///

27   ///

28   ///

17

1  The agreement between World and Mr. Kuivenhoven also prohibited
2  Mr. Kuivenhoven from disclosing to customers his affiliation and
3  agency relationship with World.  Compl., ¶ 18.  Finally,
4  Plaintiffs allege that Mr. Kuivenhoven and Transamerican "were
5  employed by an adverse party."  Compl. 52(e).

6      Plaintiffs' only allegations supporting its agency theory
7  stem from the letter from World to Mr. Kuivenhoven in which World
8  stated that Mr. Kuivenhoven was prohibited from representing
9  himself as an agent of Plaintiff. That letter indicates only that
10  World hired Mr. Kuivenhoven to market its products.  Neither that
11  letter, nor Plaintiffs' conclusory allegations suffice to show
12  that Mr. Kuivenhoven had the ability to act on behalf of World.

13      Alternatively, Plaintiffs attempt to premise World's
14  liability on a conspiracy allegation.  "The elements of an action
15  for civil conspiracy are the formation and operation of the
16  conspiracy and damage resulting to plaintiff from an act or acts
17  done in furtherance of the common design."  Doctors' Co. v.
18  Super. Ct., 49 Cal. 3d 39, 44 (1989), superseded on other grounds
19  as stated in Pavicich v. Santucci, 85 Cal. App. 4th 382 (6th
20  Dist. 2000) (quoting Mox Inc. v. Woods, 202 Cal. 675, 677-678
21  (1927)).

22      Plaintiffs allege no facts, other than those related to the
23  above discussed letter, to support the formation of such a
24  conspiracy or any subsequent acts done in furtherance of a
25  conspiracy.  As above, that letter provides no support for
26  Plaintiffs' conspiracy allegations because it purports merely to
27  prohibit Mr. Kuivenhoven from representing himself as an agent of
28  World.

1   Nothing about the letter indicates that World conspired with Mr.

2   Kuivenhoven to conceal their relationship altogether or to engage

3   in any other unfair practice.  Therefore, Plaintiffs' allegations

4   are insufficient to state a claim against World and World's

5   Motion to Dismiss Plaintiffs' Second Cause of Action is granted

6   with leave to amend.

7

8       **C.   Plaintiffs Fail to State a Claim for Breach of**
         **Fiduciary Duty Against World**

9

10      Plaintiffs argue that, by participating in and inducing

11  Mr. Kuivenhoven to act against Plaintiffs' interests and on

12  behalf of World, World aided and abetted Mr. Kuivenhoven in

13  breaching the fiduciary duties he owed Plaintiffs.  World argues

14  that Plaintiffs' breach of fiduciary duty cause of action fails

15  to state a claim and that it is preempted by HOLA.

16      Again, as a threshold matter, this Court will determine if

17  World can be held liable for Mr. Kuivenhoven's conduct.  As

18  discussed above, Plaintiffs' agency and conspiracy allegations

19  are insufficient to impart liability.  Plaintiffs' only

20  alternative theory of liability is based on aiding and abetting.

21  "[U]nder California law, a defendant may be found liable for

22  aiding and abetting a breach of fiduciary duty even though the

23  defendant owes no independent duty to the plaintiff, so long as

24  the aider and abettor knows of, and substantially assists, the

25  primary violator's breach of duty."  Neilson v. Union Bank of

26  Cal., N.A., 290 F. Supp. 2d 1101, 1137 (C.D. Cal. 2003)

27  ///

28  ///

1    In this case, Plaintiffs allege that World "knowingly

2    participated in and induced Kuivenhoven's and Transamerican's

3    breach of fiduciary duty." Compl., ¶ 71.  Plaintiffs again rely

4    on their conclusory allegation that World prohibited

5    Mr. Kuivenhoven from disclosing to Plaintiffs' his relationship

6    with World.  Compl., ¶ 18.  However, Plaintiffs' Complaint is

7    completely lacking in any factual allegations to support its

8    theory.  Plaintiffs' only allegations against World stem from the

9    same letter discussed above.  That letter does not indicate that

10   World knew or assisted in any actions by Mr. Kuivenhoven which

11   may have resulted in a breach of his duties to Plaintiffs.[4]

12   Additionally, since Plaintiffs have not alleged any independent

13   facts to support their assertion that World knowingly induced, or

14   provided substantial assistance to, Mr. Kuivenhoven, Plaintiffs'

15   claim must fail.  World's Motion to Dismiss Plaintiffs' Fifth

16   Cause of Action is granted with leave to amend.

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   _____

26   [4] Notably, in light of the inadequacy of Plaintiffs' agency
     allegations, which, for purposes of this Motion render moot
27   Plaintiffs' argument that Mr. Kuivenhoven was acting as World's
     agent, the letter simply proscribes Mr. Kuivenhoven from
28   misrepresenting himself as the agent of World.

**D.    Plaintiffs Cannot Pursue Punitive Damages Under Their Remaining Claims**

World asks this Court to strike Plaintiffs' claim for punitive damages.  Plaintiffs do not contest World's Motion. Moreover, since Plaintiffs' only remaining cause of action arises under TILA, which prescribes its own remedies under 15 U.S.C. § 1640 and does not provide for the recovery of punitive damages, Plaintiffs' prayer for punitive damages cannot stand.[5] Therefore, World's Motion to Strike is granted.

**CONCLUSION**

Plaintiffs have stated TILA, UCL, and breach of fiduciary duty claims against World.  Since Plaintiffs' TILA allegations are sufficient to state a claim, World's Motion to Dismiss Plaintiffs' First Cause of Action is DENIED.

---

[5] Section 1640 provides in pertinent part:

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part...

(1) any actual damage sustained by such person as a result of the failure;

(2)(A) (i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000, or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000...

15 U.S.C. § 1640(a)(1), (2)(A).

21

1    However, since Plaintiffs failed to allege sufficient facts

2   to support the remainder of their claims, World's Motion to

3   Dismiss Plaintiffs' Second and Fifth Causes of Action is GRANTED

4   with leave to amend. Plaintiffs shall have twenty (20)days from

5   the date of this Memorandum and Order to file an amended

6   complaint.

7    Finally, because Plaintiffs have not stated a cause of

8   action to support a claim for punitive damages, World's Motion to

9   Strike Plaintiffs' prayer for such damages is GRANTED with leave

10  to amend.  Plaintiffs shall have twenty (20)days from the date of

11  this Memorandum and Order to file an amended complaint.

12    IT IS SO ORDERED.

13  Dated: June 11, 2008

16  MORRISON C. ENGLAND, JR.
    UNITED STATES DISTRICT JUDGE

**EXHIBIT A**



**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6000

July 12, 2005

## CERTIFICATE OF CORPORATE EXISTENCE

REFERENCE: World Savings Bank, FSB
Oakland, California

    I, Nadine Y. Washington, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

    1.  World Savings Bank, FSB, Oakland, California, was chartered under the laws of the United States to transact the business of a Federal savings bank;

    2.  The charter of World Savings Bank, FSB, Oakland, California, is in full force and effect;

    3.  The Office of Thrift Supervision has not appointed a conservator or receiver for World Savings Bank, FSB, Oakland, California; and

    4.  As of July 12, 2005, World Savings Bank, FSB, Oakland, California, is operating as a BIF-insured financial institution.

Nadine Y. Washington
Corporate Secretary



**Office of Thrift Supervision**
Department of the Treasury

1700 G Street, N.W., Washington, D.C. 20552 • (202) 906-6000

**April 21, 2006**

## CERTIFICATE OF CORPORATE EXISTENCE

**REFERENCE:** World Savings Bank, FSB
Oakland, California

I, Nadine Y. Washington, Corporate Secretary, Office of Thrift Supervision, hereby certify, according to the records of the Office of Thrift Supervision, Department of the Treasury, Washington, DC:

1. World Savings Bank, FSB, Oakland, California, was chartered under the laws of the United States to transact the business of a Federal savings bank;

2. The charter of World Savings Bank, FSB, Oakland, California, is in full force and effect;

3. The Office of Thrift Supervision has not appointed a conservator or receiver for World Savings Bank, FSB, Oakland, California; and

4. As of April 21, 2006, World Savings Bank, FSB, Oakland, California, is operating as a BIF-insured financial institution.

**Nadine Y. Washington**
**Corporate Secretary**

# OTS

## Office of Thrift Supervision

SEARCH  HELP  HOME

| News & Events | Applications | Supervision | Public Info | Consumer & Community | DATA & RESEARCH | TFR | About OTS |
|---|---|---|---|---|---|---|---|

Home > Data & Research > Corporate Directories > Institution Directory Database

## Results of Search

Your search retrieved **1** record *(1 page)*.                    Record **1** to **1** of **1**.

Click on CSV to download these results in Comma Separated Value (text) format.

[ CSV ]    [ Return to Search ]    [ New Search ]

*Updated: Thursday, February 19, 2004 at 7:49 AM*

| Docket/ Region | Name/Location Telephone | Officer/Title Mailing Address | Charter Type Assets ($000) |
|---|---|---|---|
| 1. 12642<br>West | **World Savings Bank, FSB**<br>1970 Broadway<br>Oakland, CA<br>94612-0000<br>510-446-6000 | **Herbert Sandler**<br>*COB, CEO*<br>1901 Harrison St<br>Oakland, CA<br>94612-3574 | BIF Fed Stk SB<br>$ 76,219,120 |

New Search

[ Enter Keywords ]    [ Search OTS Web Site ]

[privacy policy]  [search]  [help]  [home]

**EXHIBIT B**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ELMER and KATHY BUICK,                  No. 2:07-CV-01447-MCE-KJM

       Plaintiffs,

   v.                                  MEMORANDUM AND ORDER

WORLD SAVINGS BANK,
TRANSAMERICAN FINANCIAL
CORPORATION,

       Defendants.

----oo0oo----

    Plaintiffs, Elmer and Kathy Buick, filed this action against
Defendants, Transamerican Financial Corporation ("Transamerican")
and World Savings Bank ("World"), for claims arising under the
Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and
California's Unfair Business Practices Act ("UCL"), California
Business & Professions Code § 17200 et seq., as well as for
fraud, negligent misrepresentation, and breach of fiduciary duty.

///

///

///

1

1   Plaintiffs subsequently dropped their fraud and negligent

2   misrepresentation claims against all parties, but still maintain

3   their TILA, UCL, and breach of fiduciary duty claims against

4   World.  Presently before the Court is World's Motion to Dismiss

5   those claims.[1]

6

7                              **BACKGROUND**[2]

8

9       In 2004, World marketed its Pick-a-Payment[SM] Equity Builder[SM]

10  Mortgage.  That loan had an initial low interest rate that

11  expired after three months.  The loan was structured in such a

12  way that it could potentially result in negative amortization,

13  which occurs when, despite a customer making the required minimum

14  payments, the principal owed on the loan increases, rather than

15  decreases, over the life of the loan.  Plaintiffs allege that

16  referring to a loan that can result in negative amortization as

17  an "Equity Builder[SM]" loan is false and misleading.

18      Plaintiffs further allege that World knew or should have

19  known that brokers marketing that Equity Builder[SM] loan would

20  promote its low initial rate and minimize both its higher

21  eventual interest rates and its potential for negative

22  amortization.

23  ///

24  _____

25      [1] Because oral argument will not be of material assistance,
    the Court ordered this matter submitted on the briefing.  E.D.
26  Cal. Local Rule 78-230(h).

27      [2] The following facts are taken primarily from Plaintiffs'
    Complaint.  For the purposes of this Motion, the Court accepts
28  these facts as true and makes all inferences in the light most
    favorable to Plaintiffs.

1  Additionally, Plaintiffs allege that World knew that the label

2  Equity Builder^SM was misleading, confusing, and conflicted with

3  other disclosures.  According to Plaintiffs, World provided

4  customers with documents that referenced only the low initial

5  rate, without explaining that the rate would increase in the

6  future.

7       World marketed its products through agents.  One agent was

8  Dirk Kuivenhoven, also known as Dirk Johnson, also known as Mark

9  Rawlings ("Mr. Kuivenhoven").  Mr. Kuivenhoven, a licensed

10 California mortgage broker, was Transamerican's branch manager in

11 2004.

12      In March of 2004, under the alias Dirk Johnson and on the

13 letterhead of Direct Lenders, a name Plaintiffs believe to be an

14 alias of Transamerican, Mr. Kuivenhoven sent a letter to

15 Plaintiffs offering to reduce their mortgage payments by

16 refinancing their loan at a 3.5% interest rate.  Specifically

17 that letter stated:

18         Here's what you can expect from me:
           1.   I handle all of the details from your first call
19              to closing.
           2.   I keep you up to date and well informed as we walk
20              thru [sic] the process.
           3.   I make sure you get the best rate and loan
21              possible.
           4.   I give you honest straight forward information.
22

23      When Plaintiffs subsequently met with Mr. Kuivenhoven, he

24 told them he would get them an Equity Builder^SM loan with an

25 initial rate of 1.95% and that the loan balance would decrease as

26 long as Plaintiffs made the required minimum payments.

27 ///

28 ///

3

1  Mr. Kuivenhoven also allegedly assured them that they could

2  convert the loan to a fixed rate loan by contacting World, that

3  the interest rate on the mortgage would never exceed 4.798%, and

4  that the bi-weekly payments would peak at $616 in the eighth

5  year.

6      When Mr. Kuivenhoven prepared the World loan application, he

7  indicated that the interest rate would be 1.95%, and checked the

8  "Other" box to indicate the loan type, but he did not include any

9  elaboration of the details of the particular type of loan.

10      Plaintiffs' loan closed on June 10, 2004.  World provided

11  Plaintiffs with a copy of their loan application and Uniform

12  Underwriting and Transmittal Summary, both of which showed a

13  1.95% interest rate.  Additionally, World delivered each borrower

14  copies of the notice of his or her right to rescind ("Notice"),

15  though Plaintiffs allege that Ms. Buick received only one copy,

16  rather than the two copies required under the regulations.

17      Plaintiffs further allege that they trusted, believed and

18  reasonably relied upon Mr. Kuivenhoven's representations about

19  the Equity Builder$^{SM}$ loan.  Therefore, they did not read the loan

20  papers on signing because they assumed those documents were

21  consistent with Mr. Kuivenhoven's representations.

22      Plaintiffs allege that the loan terms were not as promised

23  and that they were victims of a bait and switch.  Though the

24  initial loan rate was 1.95%, that rate was only applicable for up

25  to two months after closing and could adjust up to 11.950%.

26  ///

27  ///

28  ///

4

1   According to Plaintiffs, their current loan terms are far worse

2   than those under their prior mortgage, the deal they were

3   promised, or the loan that they could have gotten in a fair

4   market transaction.

5

6                              **STANDARD**

7   **A.    Motion to Dismiss Under Rule 12(b)(6)**

8

9        On a motion to dismiss for failure to state a claim under

10  Rule 12(b)(6), all allegations of material fact must be accepted

11  as true and construed in the light most favorable to the

12  nonmoving party.  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336,

13  337-38 (9th Cir. 1996).  Rule 8(a)(2) requires only "a short and

14  plain statement of the claim showing that the pleader is entitled

15  to relief" in order to "give the defendant fair notice of what

16  the...claim is and the grounds upon which it rests."  Bell Atl.

17  Corp. v. Twombly, --- U.S. ----, 127 S. Ct. 1955, 1964 (2007)

18  (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  While a

19  complaint attacked by a Rule 12(b)(6) motion to dismiss does not

20  need detailed factual allegations, a plaintiff's obligation to

21  provide the "grounds" of his "entitlement to relief" requires

22  more than labels and conclusions, and a formulaic recitation of

23  the elements of a cause of action will not do.  Id. at 1964-65

24  (internal citations and quotations omitted).  Factual allegations

25  must be enough to raise a right to relief above the speculative

26  level.

27  ///

28  ///

1  Id. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and

2  Procedure § 1216, pp. 235-36 (3d ed. 2004) ("The pleading must

3  contain something more...than...a statement of facts that merely

4  creates a suspicion [of] a legally cognizable right of action")).

5      A court granting a motion to dismiss a complaint must then

6  decide whether to grant leave to amend.  A court should "freely

7  give" leave to amend when there is no "undue delay, bad faith[,]

8  dilatory motive on the part of the movant, . . . undue prejudice

9  to the opposing party by virtue of . . . the amendment, [or]

10  futility of the amendment...."  Fed. R. Civ. P. 15(a); <u>Foman v.</u>

11  <u>Davis</u>, 371 U.S. 178, 182 (1962).  Generally, leave to amend is

12  denied only when it is clear the deficiencies of the complaint

13  cannot be cured by amendment.  <u>DeSoto v. Yellow Freight Sys.,</u>

14  <u>Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992).

15

16      **B.    General Pleading Requirements**

17

18      "Rule 8(a)(2)...requires a 'showing,' rather than a blanket

19  assertion of entitlement to relief.  Without some factual

20  allegation in the complaint, it is hard to see how a claimant

21  could satisfy the requirements of providing not only 'fair

22  notice' of the nature of the claim, but also 'grounds' on which

23  the claim rests."  <u>Twombly</u>, 127 S. Ct. at 1965 n.3. (factual

24  allegations necessary to plead "grounds" on which claim rests.)

25      A pleading must contain "only enough facts to state a claim

26  to relief that is plausible on its face."  <u>Id</u>. at 1974.  If the

27  "plaintiffs...have not nudged their claims across the line from

28  conceivable to plausible, their complaint must be dismissed."

1    Id.    Nevertheless, "[a] well-pleaded complaint may proceed even

2    if it strikes a savvy judge that actual proof of those facts is

3    improbable, and 'that a recovery is very remote and unlikely.'"

4    Id. at 1965.

5

6                              **ANALYSIS**

7    **A.    Plaintiffs Allege Facts Sufficient to State a TILA**
           **Claim Against World.**

8
           **1.    Plaintiffs Adequately Plead World's Failure to**
9                  **Provide the Requisite Number of Notices.**

10

11       The most straight-forward of Plaintiffs' TILA claims is

12   that, at closing, they did not receive the proper number of

13   Notices of their right to rescind.  Federal regulations state,

14   "In a transaction subject to rescission, a creditor shall deliver

15   two copies of the notice of the right to rescind to each consumer

16   entitled to rescind."  12 C.F.R. § 226.23(b)(1).  Furthermore,

17   "[i]f the required notice...[is] not delivered, the right to

18   rescind shall expire 3 years after consummation, upon transfer of

19   all of the consumer's interest in the property, or upon sale of

20   the property, whichever occurs first."  12 C.F.R. § 226.23(a)(3).

21   Plaintiffs allege that Ms. Buick received only one Notice.  If

22   true, they argue, Plaintiffs' rescission period extended to

23   include the three-year period following consummation of the

24   agreement, and Plaintiffs' May 7, 2007, request to rescind was

25   timely.

26   ///

27   ///

28   ///

                                  7

1    World disagrees and argues that Ms. Buick actually received

2    both Notices.  World produced a signed copy of the Notice to

3    support its assertion.  Nevertheless, World's form serves only to

4    create a rebuttable, rather than conclusive, presumption that

5    Ms. Buick received that document.  15 U.S.C. 1635(c).  Plaintiffs

6    are, therefore, entitled to rebut that presumption.

7    Accordingly, Plaintiffs claim that, though Ms. Buick may

8    have signed World's copy, that copy was never delivered to her as

9    required by the regulations.  Construing all facts in the light

10   most favorable to Plaintiffs, the Court cannot say that they have

11   failed to state a claim.  Plaintiffs may be able to provide

12   sufficient evidence to support their assertion that the second

13   copy of the notice was not delivered to Ms. Buick.  Hence,

14   World's defense that both Plaintiffs received all required copies

15   is not sufficient to warrant dismissal.

16   Alternatively, World argues that, regardless of the above

17   analysis, one Notice is all that TILA requires in this case

18   because Plaintiffs are married co-borrowers.  World relies on an

19   unpublished Ohio state case and a Federal Bankruptcy Court case

20   from Kansas to support its position.

21   First, in Contimortgage v. Delawder, the Ohio state court

22   was unable to determine, after a bench trial, how many notices

23   those co-borrowers actually received.  2001 WL 884085 (4th Dist.

24   Ohio 2001).  Nevertheless, the trial court stated that, even if

25   the requisite number had not been delivered, "these problems

26   constituted mere technical violations of TILA and did not extend

27   the right or rescission."  Id. at *3.

28   ///

8

1　The appellate court noted that the trial court's decision was

2　consistent with precedent holding "TILA does not require perfect

3　notice; rather, it requires a clear and conspicuous notice of

4　rescission rights." Id. (citing Smith v. Highland Bank, 108 F.3d

5　1325, 1327 (11th Cir. 1997); Veal v. Citibank, F.S.B., 85 F.3d

6　577, 580 (11th Cir. 1996)); In re Porter, 961 F.2d 1066, 1076 (3d

7　Cir. 1992)). However, that statement runs contrary to the

8　reasoning of the Ninth Circuit, which has long held that even

9　technical violations result in liability to the creditor. See

10　Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704

11　(9th Cir. 1986). Therefore, World's first case is inapposite.

12　　World's reliance on In re Jones is similarly misplaced.

13　298 B.R. 451 (D. Kan. 2003). In that case, the court

14　specifically stated that both husband and wife were entitled to

15　two copies of the Notice of rescission. Id. at 459-460.

16　Nevertheless, World places great weight on dicta in which the

17　court stated, "If Jones and his wife conceded that each of them

18　received one copy of the ... Notice, the court might be inclined

19　to agree that the rescission period should not be extended

20　because they did not each receive a second copy of the Notice."

21　Id. at 459. However, that court also went on to point out:

22　　　　The TILA and Regulation Z might easily have declared
　　　that co-borrowers who are spouses are entitled to only
23　　　one set of the required documents between them, but
　　　neither the statute nor the regulation does so.
24　　　Because the right to rescind under § 1635 exists only
　　　when borrowers are giving a mortgage on their home to
25　　　secure a loan, the most common co-borrowers are likely
　　　to be a married couple, so it is inconceivable that
26　　　Congress and the Federal Reserve Board overlooked this
　　　situation when they specified that each borrower with
27　　　the right to rescind must be given his or her own set
　　　of the documents containing all the required
28　　　information.

9

1  Id. At 460.

2      The Official Staff Commentary to 12 C.F.R. § 226.23(b)

3  confirms that court's last point:

> In a transaction involving joint owners, both of whom
> are entitled to rescind, both must receive the notice
> of the right to rescind and disclosures. For example,
> if both spouses are entitled to rescind a transaction,
> each must receive two copies of the rescission
> notice...and one copy of the disclosures.

8  12 C.F.R. Pt. 226, Supp. I, Federal Reserve Board Commentary to

9  Paragraph 23(b).  The Commentary is, at worst, persuasive

10 evidence that both husband and wife are entitled to receive two

11 copies of the Notices.  At best, according to at least one court,

12 the Commentary should be afforded the same deference as the

13 regulations themselves.  In re Wright, 133 B.R. 704, 708 (E.D.

14 Pa. 1991).  Therefore, this Court finds that both Plaintiffs were

15 entitled to receive two copies of the Notice.

16     Because Plaintiffs have adequately alleged that they

17 received less than the proper number of notices prescribed by

18 TILA, and because they similarly alleged enough facts to show

19 that they could potentially rebut the presumption created by

20 World's Motion, Plaintiffs have stated a claim against World

21 under TILA and World's Motion is denied.

23         **2.    Plaintiffs Are Not Prohibited from Seeking TILA
           Damages.**

25     World next asks this Court to strike Plaintiffs' TILA claim

26 for damages because Plaintiffs admit that they did not read the

27 loan documents and, therefore, cannot prove the reliance

28 necessary to show causation.

1   Federal Rule of Civil Procedure 12(f) provides, "The court may

2   strike from a pleading an insufficient defense or any redundant,

3   immaterial, impertinent, or scandalous matter."  "A motion to

4   strike under Rule 12(f) should be denied unless it can be shown

5   that no evidence in support of the allegation would be

6   admissible, or those issues could have no possible bearing on the

7   issues in the litigation."  <u>Gay-Straight Alliance Network v.</u>

8   <u>Visalia Unified Sch. Dist.</u>, 262, F. Supp. 2d 1088, 1099 (E.D.

9   Cal. 2001).

10       To support its argument World cites to <u>In re Smith</u>, in which

11  the Ninth Circuit stated, "[I]n order to receive actual damages

12  for a TILA violation..., a borrower must establish detrimental

13  reliance."  289 F.3d 1155, 1157 (9th Cir. 2002).  However, that

14  opinion, and World's remaining authority, concerned a TILA

15  disclosure violation, not a violation based on a lender's failure

16  to provide the proper number of Notices to a borrower.

17       Additionally, World's failure to honor Plaintiffs'

18  rescission request, which they tendered within three years of the

19  allegedly defective Notice, constitutes a distinct and actionable

20  violation.  <u>See In re Wright</u>, 133 B.R. 704 (E.D. Pa. 1991) ("The

21  failure of a lender to properly act on a rescission is a new

22  violation separate and distinct from the disclosure violation

23  that gave rise to the right to rescind.") (citing 15 U.S.C.

24  § 1640(g); 15 U.S.C. 1635(g)).  Therefore, Plaintiffs' prayer for

25  damages is sufficient to the extent it is based on World's

26  alleged failure to provide the proper number of Notices or to

27  honor Plaintiffs' request to rescind.

28  ///

11

1  See Belini v. Washington Mut. Bank, FA, 412 F.3d 17, 25 (1st Cir.

2  2005) (finding creditor that improperly failed to honor

3  rescission request could be liable for damages under section

4  1640).

5      Finally, World further argues that Plaintiffs' TILA claim is

6  barred by the one-year statute of limitations.  See 15 U.S.C.

7  § 1640(e).  However, Plaintiffs have raised a viable claim under

8  TILA regarding World's failure to deliver the proper number of

9  Notices and failure to honor Plaintiffs' request to rescind.  The

10 statute of limitations would have begun to run at the time World

11 failed to honor Plaintiffs' rescission request based on the prior

12 alleged Notice violation.  Plaintiffs filed this action within

13 one-year of their request for rescission.  Hence, Plaintiffs'

14 damages claim is not time-barred for purposes of this motion, and

15 Defendant's Motion to Strike Plaintiffs' claim for damages under

16 TILA is denied.

17

18 **B.   Plaintiffs Fail to State a Claim Against World Under
        California's Unfair Competition Law Claim, California**
19      **Business & Professions Code § 17200 et seq.**

20

21     World claims that, since it is a Federal Savings Bank, Home

22 Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461 et seq.,

23 preempts Plaintiffs' state law claims.[3]  World argues that

24 Plaintiffs' UCL claims are preempted to the extent that they

25 attempt to regulate Worlds' disclosure and advertising practice.

26 ///

27 ────────────────────

28      [3] Plaintiffs do not dispute World's assertion that it is a
   federally chartered association.

12

At the beginning of this year, the Ninth Circuit addressed a
case similar to the one at hand.  See Silvas v. E*Trade Mortgage
Corp., 514 F.3d 1001 (9th Cir. 2008).  This Court quotes at
length from that decision because that analysis is directly
applicable here:

> We have identified three ways federal law may
> preempt state law:
>
>> First, Congress may preempt state law by so
>> stating in express terms. Second, preemption
>> may be inferred when federal regulation in a
>> particular field is so pervasive as to make
>> reasonable the inference that Congress left
>> no room for the States to supplement it. In
>> such cases of field preemption, the mere
>> volume and complexity of federal regulations
>> demonstrate an implicit congressional intent
>> to displace all state law. Third, preemption
>> may be implied when state law actually
>> conflicts with federal law. Such a conflict
>> arises when compliance with both federal and
>> state regulations is a physical
>> impossibility, or when state law stands as an
>> obstacle to the accomplishment and execution
>> of the full purposes and objectives of
>> Congress....
>
> Bank of Am. v. City and County of S.F., 309 F.3d 551,
> 558 (9th Cir. 2002) (internal quotation marks and
> citations omitted).
>
> Appellants' arguments against preemption are
> premised on their assertion that *conflict* preemption
> analysis applies to the case at bar. We agree, however,
> with the district court, and hold that *field* preemption
> applies because Appellants' state law claims provide
> state remedies for violations of federal law in a field
> preempted entirely by federal law. The general
> presumption against preemption is not applicable here,
> and the relevant regulation is clear-the field of
> lending regulation of federal savings associations is
> preempted.  See 12 C.F.R. § 560.2...
>                          ...
>
> While there is a strong presumption against
> federal preemption of state law governing historic
> police powers, the Supreme Court has held that the
> presumption does not apply "when [a] State regulates in
> an area where there has been a history of significant
> federal presence." United States v. Locke, 529 U.S.
> 89, 108 (2000).

13

1    "Congress has legislated in the field of banking
     from the days of M'Cullough v. Maryland, 17 U.S. (4
2    Wheat.) 316, creating an extensive federal statutory
     and regulatory scheme." Bank of Am., 309 F.3d at 558
3    (citation omitted).  Specific to this case, Congress
     enacted the Home Owners' Loan Act of 1933 ("HOLA") to
4    charter savings associations under federal law, at a
     time when record numbers of home loans were in default
5    and a staggering number of state-chartered savings
     associations were insolvent.  Id. at 559.  HOLA was
6    designed to restore public confidence by creating a
     nationwide system of federal savings and loan
7    associations to be centrally regulated according to
     nationwide "best practices."  Fid. Fed. Sav. & Loan
8    Ass'n v. de la Cuesta, 458 U.S. 141, 160-161 (1982).
     We have described HOLA and its following agency
9    regulations as a "radical and comprehensive response to
     the inadequacies of the existing state system," and "so
10   pervasive as to leave no room for state regulatory
     control."  Conference of Fed. Sav. & Loan Ass'n v.
11   Stein, 604 F.2d 1256, 1257 (9th Cir. 1979), aff'd, 445
     U.S. 921.  "[B]ecause there has been a history of
12   significant federal presence in national banking, the
     presumption against preemption of state law is
13   inapplicable."  Bank of Am., 309 F.3d at 559 (internal
     quotation marks omitted).
14                               . . .

15        Through HOLA, Congress gave the Office of Thrift
     Supervision ("OTS") broad authority to issue
16   regulations governing thrifts.  12 U.S.C. § 1464.  As
     the principal regulator for federal savings
17   associations, OTS promulgated a preemption regulation
     in 12 C.F.R. § 560.2.  That the preemption is expressed
18   in OTS's regulation, instead of HOLA, makes no
     difference because, "[f]ederal regulations have no less
19   preemptive effect than federal statutes." de la Cuesta,
     458 U.S. at 153.  The regulation reads inter alia:

20        OTS hereby occupies the entire field of
          lending regulation for federal savings
21        associations. OTS intends to give federal
          savings associations maximum flexibility to
22        exercise their lending powers in accordance
          with a uniform federal scheme of regulation.
23        Accordingly, federal savings associations may
          extend credit as authorized under federal
24        law, including this part, without regard to
          state laws purporting to regulate or
25        otherwise affect their credit activities,
          except to the extent provided in paragraph
26        (c) of this section....

27   ///

28   ///

                              14

12 C.F.R. § 560.2(a) (emphasis added). Section
560.2(b) goes on to provide a list of specific types of
state laws that are preempted, two of which, § 560.2
(b)(5) and § 560.2(b)(9), are specifically applicable
to this case. [T]he types of state laws preempted by
paragraph (a) of this section, include, without
limitation, state laws purporting to impose
requirements regarding:

>     (5) Loan-related fees, including without
>     limitation, initial charges, late charges,
>     prepayment penalties, servicing fees, and
>     overlimit fees;
>
>                         . . .
>
>     (9) Disclosure and advertising, including
>     laws requiring specific statements,
>     information, or other content to be included
>     in credit application forms, credit
>     solicitations, billing statements, credit
>     contracts, or other credit-related documents
>     and laws requiring creditors to supply copies
>     of credit reports to borrowers or applicants;

12 C.F.R. § 560.2(b)(5) and (9).

OTS, Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept.
30, 1996).

Silvas at 514 F.3d 1004-1005 (9th Cir. 2008) (internal headings
and footnote omitted). Based on the above authority, World
argues that Plaintiffs' UCL cause of action is preempted by HOLA.

Plaintiffs allege several grounds for relief under the UCL.
Cal. Bus. & Prof. Code §§ 17200 et seq. Defendants argue that
all of Plaintiffs' claims fall directly within the ambit of
section 560.2's express preemption of state laws attempting to
regulate a federal bank's advertising and disclosures.
Plaintiffs' allegations are as follows:

///

///

///

///

///

15

1      As described above, defendants have committed acts of
       unfair competition, proscribed by Business and
2      Professions Code section 17200, et seq., including, but
       not limited to, the following:
3      a.    Representing that the loan obtained by plaintiffs,
             the "Equity Builder," would build the equity in
4            plaintiffs' home faster than other loans and, in
             doing so misled plaintiffs as to the potential for
5            and consequences of negative amortization;
       b.    Representing that the interest rate on plaintiffs'
6            mortgage would never exceed 4.798% when such
             representations were false;
7      c.    Representing that the initial interest rate on
             plaintiff' [sic] mortgage would be 1.95% and that
8            the interest rate on the loan would never exceed
             4.798% and, by doing so, misleading plaintiffs as
9            to the cost of credit;
       d.    Representing to plaintiffs that they would be able
10           to switch to a fixed rate loan at no cost when in
             fact the loan provided for a substantial
11           prepayment penalty during the first three years;
       e.    Representing to plaintiffs that Kuivenhoven and
12           Transamerican were working for plaintiffs and were
             loyal to their best interests when, in fact,
13           Kuivenhoven and Transamerican were employed by an
             adverse party;
14     f.    Representing to plaintiffs that they would be
             given the best possible loan terms and that their
15           mortgage interest rate would start at 1.95% and
             never exceed 4.798%.
16     g.    By engaging in a bait and switch by baiting
             plaintiffs into the mortgage transaction by
17           offering a relatively favorable set of terms and
             then switching to less favorable terms.
18     h.    By violating Business & Professions Code § 17500
             et seq. As set forth in paragraphs 11 through 25
19           herein.

20  SAC, ¶ 52.  With the exception of ¶ 52(e), each of these

21  allegations concerns World's advertising practices or fees and are

22  expressly preempted by the § 560.2.  See Silvas 514 F.3d at 1006.

23      Hence, Plaintiffs' only remaining viable claim falls under

24  ¶ 52(e).  Plaintiffs allege that Mr. Kuivenhoven improperly

25  maintained and misrepresented to Plaintiffs his relationship with

26  World.  Id.  Additionally, Plaintiffs argue that, under an agency

27  theory, World is responsible for Mr. Kuivenhoven's

28  misrepresentations.

                              16

1      Therefore, as a threshold matter, this Court must analyze

2  the sufficiency of Plaintiffs' agency allegations.  "One of the

3  chief characteristics of an agency relationship is the authority

4  to act for and in the place of the principal for the purposes of

5  bringing him or her into legal relations with third parties."

6  DSU Aviation, LLC v. PCMT Aviation, LLC, 2007 WL 3456564, *5

7  (N.D. Cal. 2007).  "The other important aspect in determining the

8  existence of an agency relationship is the degree of control

9  exercised by the principal over the activities of the agent."

10  Id.  "If the principal has the right to control the agent's day-

11  to-day operations, then an agency relationship exists.  If,

12  however, the principal has no control over the day-to-day

13  operations and only has [the] right to dictate the end result of

14  the agent's activities, then an 'independent contractor'

15  relationship exists."  Figi Graphics, Inc. v. Dollar Gen. Corp.,

16  33 F. Supp. 2d 1263, 1266 (S.D. Cal. 1998) (citing In re Coupon

17  Clearing Services, 113 F.3d 1090, 1099-1100 (9th Cir. 1997)).

18      Plaintiffs fail to allege sufficient facts to show that

19  Mr. Kuivenhoven had the authority to act on behalf of World.

20  Plaintiffs generally allege that Mr. Kuivenhoven is an agent and

21  co-conspirator of World.  Compl., ¶ 7.  Plaintiffs also

22  specifically allege that "World paid Mr. Kuivenhoven to market

23  its loans pursuant to a contract which gave World the right to

24  control who he could market to and what Mr. Kuivenhoven could say

25  about the World loan products he sold.

26  ///

27  ///

28  ///

17

1   The agreement between World and Mr. Kuivenhoven also prohibited

2   Mr. Kuivenhoven from disclosing to customers his affiliation and

3   agency relationship with World.  Compl., ¶ 18.  Finally,

4   Plaintiffs allege that Mr. Kuivenhoven and Transamerican "were

5   employed by an adverse party."  Compl. 52(e).

6        Plaintiffs' only allegations supporting its agency theory

7   stem from the letter from World to Mr. Kuivenhoven in which World

8   stated that Mr. Kuivenhoven was prohibited from representing

9   himself as an agent of Plaintiff. That letter indicates only that

10  World hired Mr. Kuivenhoven to market its products.  Neither that

11  letter, nor Plaintiffs' conclusory allegations suffice to show

12  that Mr. Kuivenhoven had the ability to act on behalf of World.

13       Alternatively, Plaintiffs attempt to premise World's

14  liability on a conspiracy allegation.  "The elements of an action

15  for civil conspiracy are the formation and operation of the

16  conspiracy and damage resulting to plaintiff from an act or acts

17  done in furtherance of the common design." <u>Doctors' Co. v.</u>

18  <u>Super. Ct.</u>, 49 Cal. 3d 39, 44 (1989), <u>superseded on other grounds</u>

19  <u>as stated in</u> <u>Pavicich v. Santucci</u>, 85 Cal. App. 4th 382 (6th

20  Dist. 2000) (quoting <u>Mox Inc. v. Woods</u>, 202 Cal. 675, 677-678

21  (1927)).

22       Plaintiffs allege no facts, other than those related to the

23  above discussed letter, to support the formation of such a

24  conspiracy or any subsequent acts done in furtherance of a

25  conspiracy.  As above, that letter provides no support for

26  Plaintiffs' conspiracy allegations because it purports merely to

27  prohibit Mr. Kuivenhoven from representing himself as an agent of

28  World.

1  Nothing about the letter indicates that World conspired with Mr.

2  Kuivenhoven to conceal their relationship altogether or to engage

3  in any other unfair practice.    Therefore, Plaintiffs' allegations

4  are insufficient to state a claim against World and World's

5  Motion to Dismiss Plaintiffs' Second Cause of Action is granted

6  with leave to amend.

7

8      **C.    Plaintiffs Fail to State a Claim for Breach of**
       **Fiduciary Duty Against World**

9

10     Plaintiffs argue that, by participating in and inducing

11  Mr. Kuivenhoven to act against Plaintiffs' interests and on

12  behalf of World, World aided and abetted Mr. Kuivenhoven in

13  breaching the fiduciary duties he owed Plaintiffs.    World argues

14  that Plaintiffs' breach of fiduciary duty cause of action fails

15  to state a claim and that it is preempted by HOLA.

16     Again, as a threshold matter, this Court will determine if

17  World can be held liable for Mr. Kuivenhoven's conduct.    As

18  discussed above, Plaintiffs' agency and conspiracy allegations

19  are insufficient to impart liability.    Plaintiffs' only

20  alternative theory of liability is based on aiding and abetting.

21  "[U]nder California law, a defendant may be found liable for

22  aiding and abetting a breach of fiduciary duty even though the

23  defendant owes no independent duty to the plaintiff, so long as

24  the aider and abettor knows of, and substantially assists, the

25  primary violator's breach of duty."    <u>Neilson v. Union Bank of</u>

26  <u>Cal.</u>, N.A., 290 F. Supp. 2d 1101, 1137 (C.D. Cal. 2003)

27  ///

28  ///

19

1    In this case, Plaintiffs allege that World "knowingly

2  participated in and induced Kuivenhoven's and Transamerican's

3  breach of fiduciary duty." Compl., ¶ 71.  Plaintiffs again rely

4  on their conclusory allegation that World prohibited

5  Mr. Kuivenhoven from disclosing to Plaintiffs' his relationship

6  with World.  Compl., ¶ 18.  However, Plaintiffs' Complaint is

7  completely lacking in any factual allegations to support its

8  theory.  Plaintiffs' only allegations against World stem from the

9  same letter discussed above.  That letter does not indicate that

10  World knew or assisted in any actions by Mr. Kuivenhoven which

11  may have resulted in a breach of his duties to Plaintiffs.[4]

12  Additionally, since Plaintiffs have not alleged any independent

13  facts to support their assertion that World knowingly induced, or

14  provided substantial assistance to, Mr. Kuivenhoven, Plaintiffs'

15  claim must fail.  World's Motion to Dismiss Plaintiffs' Fifth

16  Cause of Action is granted with leave to amend.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  _____

26    [4] Notably, in light of the inadequacy of Plaintiffs' agency
    allegations, which, for purposes of this Motion render moot
27  Plaintiffs' argument that Mr. Kuivenhoven was acting as World's
    agent, the letter simply proscribes Mr. Kuivenhoven from
28  misrepresenting himself as the agent of World.

20

1    **D.    Plaintiffs Cannot Pursue Punitive Damages Under Their Remaining Claims**

2

3    World asks this Court to strike Plaintiffs' claim for

4    punitive damages.  Plaintiffs do not contest World's Motion.

5    Moreover, since Plaintiffs' only remaining cause of action arises

6    under TILA, which prescribes its own remedies under 15 U.S.C.

7    § 1640 and does not provide for the recovery of punitive damages,

8    Plaintiffs' prayer for punitive damages cannot stand.[5]

9    Therefore, World's Motion to Strike is granted.

10

11                        **CONCLUSION**

12

13    Plaintiffs have stated TILA, UCL, and breach of fiduciary

14    duty claims against World.  Since Plaintiffs' TILA allegations

15    are sufficient to state a claim, World's Motion to Dismiss

16    Plaintiffs' First Cause of Action is DENIED.

17

18    _____

19    [5] Section 1640 provides in pertinent part:

      Except as otherwise provided in this section, any creditor
20    who fails to comply with any requirement imposed under this
      part...

21    (1) any actual damage sustained by such person as a result
      of the failure;

22    (2)(A) (i) in the case of an individual action twice the
      amount of any finance charge in connection with the
23    transaction, (ii) in the case of an individual action
      relating to a consumer lease under part E of this
24    subchapter, 25 per centum of the total amount of monthly
      payments under the lease, except that the liability under
25    this subparagraph shall not be less than $100 nor greater
      than $1,000, or (iii) in the case of an individual action
26    relating to a credit transaction not under an open end
      credit plan that is secured by real property or a dwelling,
27    not less than $200 or greater than $2,000...

28    15 U.S.C. § 1640(a)(1), (2)(A).

                          21

1        However, since Plaintiffs failed to allege sufficient facts

2   to support the remainder of their claims, World's Motion to

3   Dismiss Plaintiffs' Second and Fifth Causes of Action is GRANTED

4   with leave to amend. Plaintiffs shall have twenty (20)days from

5   the date of this Memorandum and Order to file an amended

6   complaint.

7        Finally, because Plaintiffs have not stated a cause of

8   action to support a claim for punitive damages, World's Motion to

9   Strike Plaintiffs' prayer for such damages is GRANTED with leave

10  to amend.  Plaintiffs shall have twenty (20)days from the date of

11  this Memorandum and Order to file an amended complaint.

12       IT IS SO ORDERED.

13  Dated: June 11, 2008

14

15

16                         MORRISON C. ENGLAND, JR.
                           UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22

23

24

25

26

27

28

                                    22